**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| CATALYST PHARMACEUTICALS, INC., 355 Alhambra Circle, Suite 1250 Coral Gables, FL 33134 | |
| Plaintiff, | |
| v. | |
| ALEX AZAR, Secretary of Health and Human Services 200 Independence Avenue, SW Washington, DC 20201; | Case No. 1:19-cv-22425-Bloom/Louis |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES 200 Independence Avenue, SW Washington, DC 20201; | Judge Beth Bloom |
| STEPHEN M. HAHN, M.D., Commissioner of Food and Drugs 10903 New Hampshire Avenue Silver Spring, MD 20993; and | |
| U.S. FOOD AND DRUG ADMINISTRATION 10903 New Hampshire Avenue Silver Spring, MD 20993, | |
| Defendants. | |

**PLAINTIFF CATALYST PHARMACEUTICALS, INC.'S OBJECTIONS TO REPORT
& RECOMMENDATION**

## **TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................3

      A.      Legal Framework ...................................................................................3

      B.      Factual Background ................................................................................5

            1.      LEMS ..........................................................................................5

            2.      Catalyst's Firdapse® ...................................................................6

            3.      Jacobus's Ruzurgi ......................................................................6

      C.      Procedural Background...........................................................................8

      D.      Additional Important Context ................................................................9

LEGAL STANDARD .................................................................................................10

ARGUMENT .............................................................................................................10

I.      THE REPORT AND RECOMMENDATION MISAPPLIED FUNDAMENTAL
      PRINCIPLES OF STATUTORY INTERPRETATION AND
      ADMINISTRATIVE LAW IN CONCLUDING THAT FDA'S RUZURGI
      APPROVAL DOES NOT VIOLATE CATALYST'S ORPHAN DRUG
      EXCLUSIVITY ...............................................................................................10

      A.      The Magistrate Judge Inappropriately Ignored The Plain Language Of The
             Statute And The Undisputed Fact That LEMS In Adults And Pediatrics Is
             The Same Disease .................................................................................11

      B.      In Reaching A Different Result, The Magistrate Judge Misapplied The
             *Chevron* Deference Doctrine In Multiple Ways ...................................13

II.     THE R&R MISCONSTRUES CATALYST'S CHALLENGE TO RUZURGI'S
      LABELING.......................................................................................................19

CONCLUSION...........................................................................................................20

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Abbott Labs v. Young*,
  920 F.2d 984 (D.C. Cir. 1990) ................................................................................................15

*Andrus v. Glover Constr., Co.*,
  446 U.S. 608 (1980) ................................................................................................................17

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*,
  713 F.3d 1080 (11th Cir. 2013) ..............................................................................................19

*CBS Inc. v. PrimeTime 24 Joint Venture*,
  245 F.3d 1217 (11th Cir. 2001) ......................................................................................11, 16

*Chevron, U.S.A. v. NRDC*,
  467 U.S. 837 (1984) ................................................................................................................10

*Comm'ncs Workers of Am. v. Beck*,
  487 U.S. 735 (1988) ................................................................................................................11

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
  941 F.3d 1288 (11th Cir. 2019) ..............................................................................................16

*Depomed, Inc. v. U.S. Dep't of Health & Human Servs.*,
  66 F. Supp. 3d 217 (D.D.C. 2014) ..................................................................................1, 4, 18

*Eagle Pharm., Inc. v. Azar*,
  2018 WL 3838265 (D.D.C. June 8, 2018), *aff'd*, 952 F.3d 323 (D.C. Cir. 2020) ............14, 18

*Eagle Pharms. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ........................................................................11, 17, 18, 19

*Engine Mfrs. Ass'n v. EPA*,
  88 F.3d 1075 (D.C. Cir. 1996) ................................................................................................18

*Fort Stewart Sch. v. Fed. Labor Relations Auth.*,
  495 U.S. 641 (1990) ................................................................................................................13

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*,
  634 F.3d 1352 (11th Cir. 2011) ................................................................................................5

*Jian Le Lin v. Att'y Gen.*
  681 F.3d 1236 (11th Cir. 2012) ..............................................................................................18

*Jordan v. Commissioner, Mississippi Dep't of Corrections*,
    947 F.3d 1322 (11th Cir. 2020) ....................................................................10

*Koch Foods, Inc. v. Dep't of Labor*,
    712 F.3d 476 (11th Cir. 2013) ......................................................................10

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998) ....................................................................15

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013) .......................................................................................4

*Pennsylvania Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998) .....................................................................................19

*Sierra Club. v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008) ....................................................................10

*Simmons v. Block*,
    782 F.2d 1545 (11th Cir. 1986) ....................................................................20

*Teva Pharm., USA v. Leavitt*,
    548 F.3d 103 (D.C. Cir. 2008) ......................................................................18

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012) ...........................................................................5

*United States v. Griffith*,
    455 F.3d 1339 (11th Cir. 2006) ....................................................................16

*Villareal v. R.J. Reynolds Tobacco Co.*,
    839 F.3d 958 (11th Cir. 2016) ......................................................................11

*Weaver v. Regan*,
    886 F.2d 194 (8th Cir. 1989) ..........................................................................4

# STATUTES

21 U.S.C.

§ 355.................................................................................................................14
§ 355(a)...............................................................................................................3
§ 355(b).............................................................................................................16
§ 355(b)(1)..........................................................................................................4
§ 355(c)(5)(D)(i)...............................................................................................16
§ 355(d)....................................................................................................2, 5, 19
§ 355f...............................................................................................................16
§ 360bb........................................................................................................passim
§ 360bb(a)...........................................................................................................5
§ 360bb(a)(1)....................................................................................................12
§ 360bb(a)(2)....................................................................................................12
§ 360cc....................................................................................................1, 4, 15
§ 360cc(a).....................................................................................................passim
§ 360cc(b)(1)..............................................................................................15, 17
§ 360cc(b)(2)....................................................................................................17
§ 360cc(c).....................................................................................................2, 17
§ 360cc(c)(1)....................................................................................................19
§ 360ccc.............................................................................................................6
§ 360ee(b)(1)(C)(ii).........................................................................................17

28 U.S.C. § 636(b)..........................................................................................10

Pub. L. No. 97-414, § 1(b), 96 Stat. 2049, 2049 (1983) (codified at 21 U.S.C.
    §§ 360aa-360ee)............................................................................................4

# REGULATIONS

21 C.F.R.

§ 201.57(c)(2)(iv).......................................................................................3, 5, 19
§ 201.57(c)(15)(i)...................................................................................3, 5, 6, 19
§ 314.50...............................................................................................................4
§ 316.3(b)(12)...................................................................................................13

74 Fed. Reg. 40,900 (Aug. 13, 2009).................................................................6

# OTHER AUTHORITIES

FDA, *Indications and Usage Section of Labeling for Human Prescription Drug and
    Biological Products—Content and Format* (July 2018),
    https://www.fda.gov/media/114443/download..................................................4, 15

## INTRODUCTION

Plaintiff Catalyst Pharmaceuticals, Inc. (Catalyst) brought this Administrative Procedure Act (APA) suit to challenge FDA's approval of Intervenor-Defendant Jacobus's competing drug Ruzurgi.  The primary issue is a straightforward question of statutory interpretation.  The plain language of 21 U.S.C. § 360cc governs the seven-year period Congress enacted for "Orphan Drug Exclusivity" (ODE) under the Federal Food, Drug, and Cosmetic Act (FDCA).  Under that provision, once FDA designates a drug as an "orphan drug" for treatment of a rare disease or condition, and then approves that same drug as "safe and effective," FDA may not approve another drug application "**for the same drug for the same disease or condition**" "for seven years."  *Id.* § 360cc(a) (emphasis added).  This seven-year ODE period is the "Act's chief financial incentive," *Depomed, Inc. v. U.S. Dep't of Health & Human Servs.*, 66 F. Supp. 3d 217, 221 (D.D.C. 2014), and a major reason that Catalyst and other companies invest to develop orphan drugs.

Resolving this case should also be straightforward because the relevant facts are undisputed.  FDA admits that (1) it granted Catalyst's orphan drug Firdapse this seven-year period of exclusivity, which expires no earlier than November 28, 2025, *see* FDA Cross-MSJ at 3-4, ECF No. 47; (2) Ruzurgi is the "same drug" as Firdapse, Report & Recommendation (R&R) at 9 (noting this is undisputed); and (3) both drugs are for the "same disease or condition"—Lambert Eaton Myasthenic Syndrome (LEMS).  *See infra* at 11-12 & n.9.  Thus, the statute unambiguously prohibited Ruzurgi's approval until at least November 28, 2025.

The Magistrate Judge mistakenly took a different course.  The Background section of the R&R incorrectly described FDA's conclusion regarding LEMS:  "LEMS in adults is not the same disease . . . as LEMS in children."  R&R at 6.  In fact, there is no factual or scientific dispute on this point—LEMS is one single "disease or condition," and no separate "pediatric LEMS" disease exists.  FDA did not and could not made any finding otherwise.  *See infra* at 11-12 & n.9.  Instead,

FDA subdivided two different patient subpopulations *within the same single disease*, and awarded Catalyst exclusivity for one (adults) and Jacobus exclusivity for the other (the approximately 15-20 pediatric LEMS patients that exist). That ignored the clear statutory text and also practically eliminated Catalyst's exclusivity for adults, who are now prescribed Jacobus's pediatric drug off-label. To justify disregarding the clear statutory text ("same disease or condition") the Magistrate Judge deferred to FDA's argument that the phrase is ambiguous, and should essentially be read to mean: "same disease or condition *unless* FDA chooses to subdivide separate indications and patient subpopulations and split statutory exclusivity among multiple drugs." Nothing in the statute justifies that reading, and multiple other courts hearing similar disputes have already rejected the type of FDA argument the Magistrate Judge adopted here. *See infra* at 18. Moreover, Congress supplied FDA with very specific authority to address situations where patient subpopulations within a single disease might not be adequately served by an existing drug with exclusivity, in 21 U.S.C. § 360cc(c), (enacted 2017), by allowing for a second drug to be approved for the same disease or condition if it is "clinically superior" for that additional subpopulation or use. The R&R fails to address this clinical superiority provision, and FDA did not (and indeed could not) make that required clinical superiority finding here. Ultimately, the R&R's atextual reading of "same disease or condition" allows FDA to subdivide an ODE into *many different parts*—defeating the purpose of Congress's *exclusivity* incentive. *See infra* at 14-19.

In addition to this straightforward statutory interpretation issue, the FDCA also prohibits FDA from approving drugs that contain "false or misleading" labeling. 21 U.S.C. § 355(d). FDA applies these statutory provisions through its regulations, which explicitly prohibit approval of a drug with a label that "impl[ies] or suggest[s]" that the drug can be used for an unapproved indication. Ruzurgi's labeling for pediatric patients violates these regulations and the statute as a

matter of law because it "impl[ies]" or "suggest[s]" that it can be used effectively for adults despite its approval only for pediatrics. *See* 21 C.F.R. § 201.57(c)(2)(iv), (15)(i) (prohibiting this false or misleading claim). This is representative of the problematic effect of the FDA's "subdivision" move—Ruzurgi is supposedly only FDA-approved for pediatric patients, but the label itself explains why it is effective for adults by walking through the adult clinical studies on which Jacobus's approval relies. The R&R appears to have misconstrued Catalyst's argument that FDA did not apply its regulations instead as an argument that FDA failed to require Jacobus to "conduct[] clinical trials . . . in children." R&R at 15. Neither the R&R nor FDA addresses how Ruzurgi could possibly have been approved with a roadmap to unapproved use in its labeling.

Finally, additional information came to light during briefing that may help further frame these issues for the Court. First, although FDA and Intervenor Jacobus argued initially that the very few pediatric LEMS patients would lose access to LEMS medication if Catalyst prevails, that is false. *See infra* at 9. No patients will lack access to a safe and effective treatment for the disease. *Id.* Second, FDA began this case by acknowledging that it did not and could not legally *consider* "pricing issues" when deciding the issues here. But as the R&R describes, Freedom of Information Act (FOIA) documents released during the pendency of this case demonstrate FDA did in fact "*consider*" pricing—although the Magistrate Judge concluded, based on available record material, that FDA did not actually impermissibly *rely* on pricing in rendering its decisions. Nevertheless, this backdrop for FDA's decisions provides helpful additional context in understanding what FDA was improperly attempting to achieve.

## BACKGROUND

### A.    Legal Framework

The FDCA generally prohibits the introduction of any "new drug" into interstate commerce absent premarket approval by FDA. 21 U.S.C. § 355(a). Premarket approval results from FDA

3

review of a New Drug Application (NDA) that contains, among other things, adequate data demonstrating that the drug is both safe and effective.  *Id.* § 355(b)(1); *see also* 21 C.F.R. § 314.50.[1]  "The process of submitting an NDA is both onerous and lengthy," *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 476-77 (2013), and the investment required to develop a drug often runs into the hundreds of millions of dollars.  Congress has enacted several statutory marketing exclusivities to encourage sponsors to undertake the NDA process in certain circumstances, including when only a small number of patients would benefit from the drug.  FDA has not always seen eye-to-eye with Congress about the wisdom of these exclusivities and has made various attempts to limit them through administrative action.  Courts, respecting *Congress's* policy-making role in our constitutional system, have repeatedly rebuked these efforts.  *See* Catalyst MSJ at 5, ECF No. 38.

This case involves ODE, which Congress added to the FDCA through the Orphan Drug Act in 1983, to incentivize development of drugs for "rare diseases and conditions" (*i.e.*, those affecting 200,000 or fewer persons in the United States).  Pub. L. No. 97-414, § 1(b), 96 Stat. 2049, 2049 (1983) (codified at 21 U.S.C. §§ 360aa-360ee).  Congress recognized that developing such drugs would be uneconomic without an exclusivity period, *see* 96 Stat. at 2049, so the Act provides "a seven-year period of marketing exclusivity granted to certain drugs pursuant to section 360cc of the Act."  *Depomed*, 66 F. Supp. 3d at 221.

---

[1] FDA does not approve drugs in the abstract; rather it approves them with specific "indications"— a very broad concept that differentiates from whether a drug, for instance, should be prescribed with other drugs, or for only specific groups of individuals.  *See* FDA, *Indications and Usage Section of Labeling for Human Prescription Drug and Biological Products—Content and Format* at 3-4 (July 2018) (emphasis added) (*Indications Guidance*), https://www.fda.gov/media/114443/download; *Weaver v. Regan*, 886 F.2d 194, 198 (8th Cir. 1989).

Under this regime, a sponsor may request that FDA designate its potential drug for a rare disease or condition as an "orphan drug."  21 U.S.C. § 360bb.  To receive this designation, the company must show that its potential drug is being developed for use in a "rare disease or condition" as defined in the statute.  *Id.* § 360bb(a).  If, after the sponsor completes all the required clinical and non-clinical studies and FDA ultimately approves the designated drug as safe and effective, then FDA may not approve applications by other companies to market the "same drug" for the "same disease or condition" for 7 years.  *Id.* § 360cc(a).  This is the ODE.

The FDCA also specifically enumerates other circumstances where FDA "shall . . . refus[e]" to approve an NDA.  21 U.S.C. § 355(d).  Relevant here, FDA must deny approval when a drug's proposed labeling "is false or misleading in any particular."  *Id.*  FDA's regulations implement that prohibition by, among other things, prohibiting approving labeling that describes clinical studies in a way that suggests or implies that a drug can be used for any unapproved indications or uses—including any uses barred by ODE.  21 C.F.R. §§ 201.57(c)(2)(iv), (15)(i).[2]

## B.    Factual Background

### 1.    *LEMS*

LEMS is a "rare, autoimmune" disease where the immune system attacks the body's own tissues.  JA-993.[3]  It affects the body's "neuromuscular junction" and in essence impedes nerve

---

[2] Once approved, the FDCA prohibits manufacturers from "promoting or marketing their drugs for" off-label uses."  *See Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1356 n.5 (11th Cir. 2011).  Physicians, however, "may prescribe FDA-approved drugs for any therapeutic use that is appropriate in their medical judgment," including unapproved uses.  *United States v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012).  FDA was specifically aware in this case that Jacobus's drug, if approved for the very few pediatric LEMS patients, would likely be prescribed for the adult LEMS population for whom Catalyst has ODE.  See Catalyst Mot. to Complete the Administrative Record at 16, ECF No. 55.

[3] "JA-" citations are to the Joint Appendix, ECF No. 66.

cells from sending signals to muscle cells. *Id.* According to the FDA, there are only approximately 950 to 1,300 individuals diagnosed with LEMS in the United States. JA-885.

2.      *Catalyst's Firdapse®*

Catalyst developed an NDA for Firdapse® (amifampridine phosphate) to treat LEMS. JA-784. Amifampridine is the "active moiety" (active ingredient) in Firdapse. JA-884. Amifampridine counteracts LEMS by enhancing neuromuscular transmission and improving muscle function. *Id.* FDA designated Firdapse as an "orphan drug" for "treatment of Lambert-Eaton Myasthenic Syndrome (LEMS)" in 2009, JA-781, and after years of drawn-out and complicated regulatory proceedings, approved Firdapse on November 28, 2018 for treatment of adults with LEMS. JA-1021. FDA then recognized that Firdapse was entitled to orphan drug exclusivity through at least November 28, 2025. JA-1040-41.

3.      *Jacobus's Ruzurgi*

Jacobus developed an NDA for Ruzurgi (amifampridine) to treat LEMS. JA-428. It is undisputed that Ruzurgi and Firdapse are the "same drug" under the Orphan Drug Act. *See* R&R at 9. It is also undisputed that they treat the same disease: LEMS. *See infra* at 11-12 & n.9. Decades ago (before it was approved), Jacobus began supplying its drug, including to pediatric patients, in a program that provides unapproved drugs to treat patients "under an expanded access I[nvestigational] N[ew] D[rug] [IND] application." JA-126; *see also* 74 Fed. Reg. 40,900 (Aug. 13, 2009) (explaining FDA's "expanded access" program). This program, authorized under 21 U.S.C. § 360ccc, can continue to supply LEMS medication to the very few pediatric LEMS patients in the absence of an approved product for pediatric LEMS. Catalyst also operates a similar program that could, and did, supply medication for pediatric patients with LEMS absent Ruzurgi's approval. *See* JA-1011.

Jacobus filed the Ruzurgi NDA at issue on June 15, 2018, seeking approval to treat LEMS "in patients 9 years or older."  JA-60.  Shortly after Firdapse's approval, FDA and Jacobus met to discuss whether Jacobus's application could still be approved in light of Catalyst's ODE.  JA-469; JA-474.  FDA, however, was quickly inundated with misleading and uninformed claims, including from politicians, that Firdapse's price would make it inaccessible for adult LEMS patients.  *See* ECF No. 74 at 9 (Magistrate Judge ruling directing FDA to add documents to the administrative record).[4]  While this was going on, FDA opted unilaterally to "administratively divide[]" the patient groups for which Jacobus sought approval "[b]ecause Firdapse has orphan exclusivity for the treatment of LEMS in adults that could potentially block approval of amifampridine (Ruzurgi) in that population, the review of the [Jacobus] NDA was administratively divided into 'Original 1' for treatment of LEMS in patients 6 to less than 17 years of age and 'Original 2' for the treatment of LEMS in adults to allow for independent actions in these populations."  *See* JA-395.[5]  Interestingly, Jacobus's clinical trials did not include pediatric LEMS patients.  JA-390 (finding all LEMS patients in Jacobus's clinical study were between "age 23 to 83 years").  Ruzurgi's initial labeling submission by Jacobus also expressly admitted that safety and efficacy in children was not established.  JA-760.[6]  During this same time period, Catalyst began gathering further scientific material to support a pediatric indication for Firdapse, for which it was already entitled to seven

---

[4] Jacobus's price was ultimately not wholly different than Catalyst's (considering underlying investments in approval), and Catalyst has developed a comprehensive program to help patients pay $10 or less per month for Firdapse out of pocket.  *See*, *e.g.*, Catalyst Supp. Br. at 7 n.4, ECF No. 75.  The average co-pay for Firdapse patients is currently less than $2 out of pocket.

[5] The record does not reflect Jacobus ever expressing interest in a pediatric-only approval—there are only approximately 15 pediatric patients nationwide, see Catalyst MSJ at 3 n.4, and so it would be uneconomic for an entity to seek to market a drug only to such a small number of patients, much less perform the types of follow-up testing necessary to maintain such an approval.

[6] Jacobus did submit limited pediatric *safety* data from its "expanded access program," but no *efficacy* data for pediatric patients appears in the record.  JA-357-58; JA-442.

years of marketing exclusivity.  *See* Catalyst Mot. to Complete the Administrative Record at 15

(FDA internal email showing FDA was aware that Catalyst was collecting this data).

On May 6, 2019, FDA approved Ruzurgi for treatment of LEMS "in patients 6 to less than

17 years of age" (pediatric patients) and granted Jacobus *ODE* for those few patients.  JA-428.

FDA concluded that it could do so, notwithstanding Catalyst's ODE, because Ruzurgi was

approved for a different "indication or use" (*i.e.*, for pediatric patients, instead of adults) "within

that same disease or condition" (LEMS) that Firdapse was approved for.  JA-426.  Ruzurgi's

approved labeling states that "[u]se of RUZURGI in patients 6 to less than 17 years of age is

supported by evidence from adequate and well-controlled studies of RUZURGI in *adults* with

LEMS."  JA-442 (emphasis added).  At that time, Catalyst could no longer pursue an indication

for pediatric patients.  It is undisputed that, since FDA's approval of Jacobus's Ruzurgi for

pediatric patients, physicians have prescribed Ruzurgi off-label for numerous adults.

### C.    Procedural Background

As relevant here, Catalyst has raised two claims.  First, that the plain language of the

Orphan Drug Act prohibited FDA from approving Ruzurgi because it is the "same drug" as

Firdapse and treats the "same disease or condition" as Firdapse.  *See* Catalyst MSJ at 13-19.

Second, that FDA could not approve Ruzurgi due to its "false or misleading labeling," specifically

because it suggests that "the drug can be used for *adult* patients with LEMS, notwithstanding the

fact that [it] only obtained approval to treat *pediatric* patients"—in plain violation of the FDCA

and FDA regulations.  Catalyst MSJ at 20.

On July 30, 2020, the Magistrate Judge issued her R&R.  ECF No. 93.  On Catalyst's

primary Orphan Drug Act statutory claim, the R&R concluded that the statutory text "same disease

or condition" is ambiguous, and thus that FDA has discretion to interpret that phrase and split ODE

among different drugs labeled for different patent subpopulations (*i.e.*, different indications).  R&R

at 4, 9-10, 14.  The R&R then misconstrued Catalyst's claim about FDA's failure to apply the mandatory statutory and regulatory labeling restrictions instead as a claim about whether FDA fully considered the scientific submissions in the Jacobus application in assessing its labeling. Without addressing the statutory or regulatory text, the R&R concluded that "multiple groups and divisions within" FDA reviewed Ruzurgi's labeling, and, because they approved it, it was not false or misleading.  *Id.* at 15-16.

### D.    Additional Important Context

During prior briefing issues arose that provide important context framing the questions in this case.  First, at the outset, Jacobus and FDA argued that pediatric LEMS patients would lack access to LEMS medication if Catalyst prevails in this suit.  *See* Jacobus Cross-MSJ at 7, ECF No. 46; *cf.* FDA Cross-MSJ at 1.  As the prior briefing thoroughly explains, *this was simply not true*, as FDA's own documents demonstrate.  ECF No. 70-1 at 5 ("[O]nce [Firdapse] is commercially available, Jacobus may continue to provide their investigational drug for expanded access . . . for patients less than 18 years of age for both LEMS and non-LEMS.").  No ruling in Catalyst's favor will deprive any pediatric LEMS patient of access to appropriate medication.

Second, at the outset of the case, FDA acknowledged that it legally "cannot consider" drug pricing issues in evaluating the exclusivity issues in this case.  *See* FDA Cross-MSJ at 12.  But FOIA records came to light afterwards indicating that is precisely what FDA did—in response to pressure from elected officials.  *See* ECF No. 74 at 9 (Senator Sanders demanded FDA "take action immediately" regarding Firdapse price); *id.* at 7 (FDA internal email expressing that Ruzurgi decision "by necessity [will] have to occur against this backdrop").  And although drug pricing is not legally relevant in this case, Catalyst's pricing reflects the tremendous investments it made in drug development and approval.  *See* Catalyst MSJ at 8-9.  The R&R recognized that FDA did

"consider" pricing information—which FDA acknowledged it lacked authority to do—but then applied a different standard to determine that this did not invalidate the approval.  R&R at 17.

## LEGAL STANDARD

This Court must make a *de novo* determination of those portions of the R&R to which an objection is made, 28 U.S.C. § 636(b), as well as all legal conclusions in the R&R, *Jordan v. Commissioner, Mississippi Dep't of Corrections*, 947 F.3d 1322, 1327 (11th Cir. 2020).

## ARGUMENT

**I.     THE REPORT AND RECOMMENDATION MISAPPLIED FUNDAMENTAL PRINCIPLES OF STATUTORY INTERPRETATION AND ADMINISTRATIVE LAW IN CONCLUDING THAT FDA'S RUZURGI APPROVAL DOES NOT VIOLATE CATALYST'S ORPHAN DRUG EXCLUSIVITY**

Without employing the traditional tools of statutory construction, the Magistrate Judge found that the ODE provision was ambiguous and deferred under *Chevron, U.S.A. v. NRDC* to FDA's imposition of a new extra-statutory limitation on ODE.  467 U.S. 837 (1984) (*Chevron*).  Although *Chevron* permits a Court to defer to an agency's interpretation of an ambiguous statutory provision in certain circumstances, courts must "exhaust the traditional tools of statutory construction" first.  *Sierra Club. v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008); *Koch Foods, Inc. v. Dep't of Labor*, 712 F.3d 476, 480 (11th Cir. 2013) (same).  If the R&R had employed those tools, the analysis would have started and ended with applying the plain statutory text to the undisputed facts of this case, yielding a recommendation that judgment be entered for Catalyst.  The application of *Chevron* in the R&R was significantly out of step with current administrative

law doctrine and principles of statutory interpretation recognized by the Supreme Court and Eleventh Circuit, and should not be followed for the reasons detailed below.

**A.    The Magistrate Judge Inappropriately Ignored The Plain Language Of The Statute And The Undisputed Fact That LEMS In Adults And Pediatrics Is The Same Disease**

The most important tool of statutory interpretation is the plain statutory text, *see CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 n.6 (11th Cir. 2001) ("[T]he clear language of a statutory provision holds a status above that of any other canon of construction."); *Villareal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 970 (11th Cir. 2016) ("[W]e do not defer to an agency's interpretation of a statute when the text is clear."), including how Congress chose to "statutorily define[]" key terms, *see Comm'ncs Workers of Am. v. Beck*, 487 U.S. 735, 766 (1988). The relevant statutory text is clear.    The exclusivity provision provides that "**[I]f** [FDA] . . . approves an application . . . for a drug designated under section 360bb of this title for a rare disease or condition," **then** "the Secretary may not approve another application . . . for the same drug for the same disease or condition . . . until the expiration of seven years."  21 U.S.C. § 360cc(a) (emphasis added).  As the D.C. Circuit has held, this statutory language employs a "familiar and readily diagrammable formula, '**if x and y, then z.**'"; specifically, *if* **(x)** FDA designates *and* **(y)** approves a drug under the Orphan Drug Act, *then* **(z)** "[u]nder the plain language of this provision, the FDA is barred from approving another application for 'such drug'[7] for the same disease for seven years."  *Eagle Pharms. v. Azar*, 952 F.3d 323, 331 (D.C. Cir. 2020).

Here, it is undisputed that **(x)** FDA designated Catalyst's drug Firdapse for the "rare disease or condition" LEMS on November 12, 2009.  JA-781.  The statute defines a "designated" drug as

---

[7] The Orphan Drug Act was amended after the facts giving rise to the *Eagle* case occurred so that the statute now uses the language "same drug" in place of the language "such drug."  That change is not relevant to this case.

one that FDA "finds . . . will be investigated for a rare disease or condition and if an application for such drug is approved . . . the approval . . . would be for use for such disease or condition." 21 U.S.C. § 360bb(a)(1). And the statute defines a "rare disease or condition" as a specific medical impairment (a disease or condition) impacting small numbers of people. 21 U.S.C. § 360bb(a)(2). It is likewise undisputed that **(y)** Firdapse was approved for use in treating LEMS on November 28, 2018. JA-1021. As a result, **(z)** FDA could not thereafter approve another application for the "same drug" for "the same disease or condition" for seven years. 21 U.S.C. § 360cc(a).

In applying **(z)**, the R&R correctly recognized that it is undisputed that Firdapse and Ruzurgi are the "same drug." *See* R&R at 9. The R&R then framed (at 9-10) the remaining question as "whether LEMS in adults and pediatric patients constitutes the same 'disease or condition.'" The R&R should have answered that question in the affirmative based on the undisputed facts. LEMS—whether it manifests itself in adults or children—is unquestionably the same disease.[8] That is why FDA ***conceded*** that "LEMS" is a *single* disease or condition, and that Firdapse and Ruzurgi are both approved to treat "**a subset** of that [single] disease or condition" (LEMS in adults vs. LEMS in pediatrics). FDA Cross-MSJ at 15-16 (emphasis added). Jacobus likewise acknowledged that FDA "recognized that LEMS was a **single** disease." Jacobus Cross-MSJ at 11 n.3 (emphasis added). In other words, not only has no party to this case argued that LEMS in adults is a different disease than LEMS in children, both defendants here affirmatively accepted that LEMS is a single disease.[9]

---

[8] Medical conditions *do* sometimes manifest as different "diseases" in adults versus children. *See* Catalyst MSJ at 7 (explaining one example as presented by the World Health Organization). But this is not the case with LEMS.

[9] Both defendants accepted this conclusion for good reason. The administrative record unequivocally shows that, as a factual and medical matter, LEMS is the same disease whether it manifests itself in adults or children. *See* Catalyst MSJ at 15-16 (describing the many undisputed

With the relevant facts undisputed, this should have been a straightforward case.  Ruzurgi is the "same drug" as Firdapse, and was for the "same disease or condition," LEMS.  Accordingly, under the plain text of the Orphan Drug Act, FDA should not have approved Ruzurgi.

### B.   In Reaching A Different Result, The Magistrate Judge Misapplied The *Chevron* Deference Doctrine In Multiple Ways

As noted, the R&R twice mistakenly indicates that FDA's review team reached a conclusion that adult and pediatric LEMS were two different diseases.  *See* R&R at 6.  FDA did not do that; it instead concluded that Ruzurgi could be approved because the agency has interpreted the statute to allow for a subsequent "same drug" to be approved for the "same disease or condition" if the approval is for different subpopulations of patients, meaning different "indications or uses ***within*** that ***same*** disease or condition."  JA-426 (emphasis added); *see* 21 C.F.R. § 316.3(b)(12).  More specifically, FDA concluded "same disease" could mean: same disease, unless we decide to split apart two different subpopulations with the disease (*i.e.* indications) and approve two separate drug applications for each.  The Court's decision must turn on this rationale.  *See Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 651-52 (1990) ("[I]f an agency's decision is to be sustained in the courts on any rationale under which the agency's factual or legal determinations are entitled to deference, it must be upheld on the rationale set forth by the agency itself.").

FDA did not claim it could do this because adult and pediatric LEMS are different diseases, but, instead, because FDA believes other terms in the statute should be read to necessitate that the term "same disease or condition" have a different meaning than those words usually bear.  Specifically, FDA stresses that it "designates" a drug under Section 360bb earlier in the orphan

---

administrative record statements that show LEMS affects adult patients the same as it affects pediatric patients).

13

drug process, and then later in the process makes a final decision about approving a drug, under Section 355 and the ODE provision at Section 360cc(a). FDA's argument essentially is that because the decision to designate the drug might contemplate a larger variety of patient populations or indications than the final approval, FDA needs flexibility later in the process to limit the scope of ODE to only a subset of patients with the "same disease or condition," and allow competition for other uses.[10] FDA Cross-MSJ at 15-16. This interpretation has at least six fatal flaws.

First and most obviously, the term "same disease or condition" is simply not ambiguous. It cannot mean "same disease or condition, *unless* FDA decides at some point later in the regulatory process that it wishes to limit the scope of exclusivity," which is what FDA is essentially arguing here. As explained *supra* at 11-12, Congress explicitly defined this term, and FDA had no authority to ignore that definition and invent its own.

Second, nothing about the interplay of other Orphan Drug Act provisions can render the straightforward term "same disease or condition" ambiguous. The same statutory provision containing the term "same disease and condition," 21 U.S.C. § 360cc(a), also expressly refers to the designation under Section 360bb, and instructs FDA not to approve another drug for the "same disease or condition" for which FDA issued that original designation under 360bb at the outset of the regulatory process. More specifically, the term "same disease or condition" in that statutory prohibition refers to text immediately preceding it in that same sentence: "designated under section 360bb." 21 U.S.C. § 360cc(a). In addition, Congress empowered FDA to break exclusivity if the

---

[10] FDA made a very similar argument in a previous case about how the timing logistics of designation and approval created a basis for the agency to modify the operation of exclusivity, but the court rejected it. *See Eagle Pharm., Inc. v. Azar*, 2018 WL 3838265, at *8 (D.D.C. June 8, 2018) (rejecting FDA's argument that the "timing structure of the Orphan Drug Act suggests that Congress intended to hand out the benefits of orphan-drug designation liberally, while more carefully restricting the benefit of orphan-drug exclusivity"), *aff'd*, 952 F.3d 323 (D.C. Cir. 2020).

manufacturer with ODE "cannot ensure" sufficient quantities of the drugs for "persons with the disease or condition for which the drug was **designated**," *id.* § 360cc(b)(1)—showing that Congress's focus with ODE is on the designated disease. So, when applying Section 360cc to determine the scope of a drug's exclusivity, FDA must reference the "rare disease or condition" identified in the first drug's Section 360bb designation. FDA has no discretion to do anything else. The designated rare disease was LEMS; not "adult" or "pediatric" LEMS. JA-781.

Third, although the R&R infers that the term "same disease or condition" in 360cc(a) must be tied to the scope of Catalyst's approval in this case, no text in the provision supports this, either directly or indirectly. If Congress actually intended 360cc(a) to operate that way, it could have spelled that out expressly. For example, Congress might have provided that FDA "may not approve another application … for the same drug for the same disease or condition, except for indications (or subpopulations of patients) not covered by the initially approved drug." Congress did not do that, and it is easy to see why: It would vest FDA with an unreasonable amount of discretion. "Indications" is an enormously broad concept that includes not only the disease or condition itself, but also "subpopulations" within that disease or condition. *See Indications Guidance* at 3-4. Allowing FDA to split what is supposed to be market *exclusivity* among many possible differing indications would all but eliminate Congress's incentive structure and would severely chill orphan drug development.[11] The interpretation FDA advances now also directly

---

[11] The Magistrate Judge appeared to be focused on the idea that the statute "does not provide whether the same 'disease or condition' refers to that disease or condition for which the drug was designated as an orphan drug or the disease or condition for which it ultimately received marketing approval." R&R at 12. But if the statute were truly ambiguous in that respect—and it is not, *supra* at 11-12—the R&R still misapplied *Chevron*. FDA would have had leeway simply to pick one of the two options, *not* to introduce brand new limitations. *See Abbott Labs v. Young*, 920 F.2d 984, 987 (D.C. Cir. 1990) (FDA did not "reasonably" interpret statutory ambiguity that could "refer to either" of two possible scenarios when agency's interpretation extended more broadly than to pick one of the two scenarios); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1069 (D.C. Cir. 1998)

contradicts what FDA told Catalyst at the designation stage, which was that the *designated* disease was dispositive for exclusivity purposes. *See* JA-781 ("[I]f [your] drug receives marketing approval for an indication ***broader*** than what is ***designated***, it may not be entitled to exclusive marketing rights" (emphasis added)).[12]

Fourth, although Congress used the terms "indication" or "uses" elsewhere in the FDCA to draw distinctions between specific approved uses of a drug, Congress chose not to use those terms in the ODE provision. *See, e.g.*, 21 U.S.C. § 355f (no exclusivity for a "subsequent . . . product" that only "results in a new indication"); *id.* § 355(c)(5)(D)(i) (defining "qualified indication"); *id.* § 355(b) (NDA applicant must show "drug is safe for use"). Congress therefore could not plausibly have intended for them to be interchangeable with "disease or condition." *See CBS Inc.*, 245 F.3d at 1225-26 ("[W]here Congress includes particular language in one section of a statue but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *United States v. Griffith*, 455 F.3d 1339, 1342 (11th Cir. 2006) ("If Congress had wanted to limit the [statutory] requirement in [a specific provision], it could have done so, as it did in [another provision] ….").

Fifth, other provisions of the Orphan Drug Act show that Congress explicitly did not intend for a "disease or condition" to be sliced and diced by FDA according to "subpopulations" or "subgroups." For example, the Orphan Drug Act contains an authorization for FDA to make grants

---

("FDA has embarked upon an adventurous transplant operation in response to blemishes in the statute that could have been alleviated with more modest corrective surgery."). And under either option, LEMS is still LEMS; not two different diseases.

[12] FDA may claim that its interpretation should be followed because it has been codified as a regulation. But that would be wrong, as foundational administrative law principles make crystal clear. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1299 (11th Cir. 2019) ("[R]egulations cannot contradict their animating statutes.").

to conduct research to "understand the full spectrum of the disease manifestations, including …
identifying and defining distinct subpopulations affected by *a* rare disease or condition." 21 U.S.C.
§ 360ee(b)(1)(C)(ii) (emphasis added).   The text speaks in the singular: "**a** rare disease or
condition" that affects "distinct subpopulations."   *Id*.   Clearly, Congress did not think different
subpopulations affected by a disease in fact were suffering from *different* diseases.

Sixth, the Orphan Drug Act explicitly provides three specific circumstances where FDA
may actually approve a second "same drug" for the "same disease or condition" notwithstanding
ODE: if (1) the entity with ODE "cannot ensure the availability of sufficient quantities" of its drug,
21 U.S.C. § 360cc(b)(1); (2) the entity with ODE consents "in writing," *id.* § 360cc(b)(2); or (3) a
subsequent drug sponsor can "demonstrate" to FDA that its drug is "clinically superior" to the
drug with ODE, *id.* § 360cc(c).   Cardinal rules of statutory interpretation require this list of
exceptions to ODE to be treated as exclusive.   *See, e.g.*, *Andrus v. Glover Constr., Co.*, 446 U.S.
608, 616-17 (1980) (where "Congress explicitly enumerates certain exceptions to a general
prohibition, additional exceptions are not to be implied."); *Eagle Pharm.*, 952 F.3d at 331 (the
Orphan Drug Act "leaves no room for the FDA to place additional requirements" on exclusivity).
In other words, Congress left FDA with no basis to add *another* exception to ODE—where the
"same drug" is for the "same disease or condition" but for a *different* indication, use,
subpopulation, or subgroup.   The statutory provision on "clinical superiority" is particularly
relevant here.   There, Congress instructed FDA what to do in a situation where a subsequent
applicant (like Jacobus here) was seeking approval for the "same drug" for the "same disease or
condition" as the already approved drug.   That provision mandates that "the Secretary shall require
such sponsor … to demonstrate that such drug is clinically superior to an already approved or
licensed drug that is the same drug."   21 U.S.C. § 360cc(c) (emphasis added).   FDA did not take

17

these actions here (nor could it factually), and thus could not approve Jacobus, much less grant it an "exclusive approval" for pediatric patients.

To reach its erroneous recommendation, the R&R wrongly distinguished the two most directly applicable precedents, *Eagle*, 2018 WL 3838265, and *Depomed*, 66 F. Supp. 3d 217. Both cases flatly rejected the sort of argument that FDA is advancing in this case and that the R&R seems to implicitly accept (at 11)—that because Congress was "silent" about the scope of exclusivity "where the drug with orphan drug exclusivity was not approved for the entirety of the disease or condition" but rather "only a subset of that disease or condition," FDA is allowed to determine what happens through regulatory fiat. But as the *Eagle* and *Depomed* courts explained, that is *not* how *Chevron* works. "The only 'silence' that matters under *Chevron* is one that remains after the Court has applied the traditional tools of statutory construction." *See Eagle Pharm.*, 2018 WL 3838265, at *6; *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996); *Jian Le Lin v. Att'y Gen.* 681 F.3d 1236, 1240 (11th Cir. 2012). And under the traditional tools, if "the text clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is 'silent' in the *Chevron* sense." *Eagle Pharm.*, 952 F.3d at 331; *Teva Pharm., USA v. Leavitt*, 548 F.3d 103, 106 (D.C. Cir. 2008) (same); *Jian Le Lin*, 681 F.3d at 1240. Here the text requires a specific outcome: FDA must honor ODE for a "disease or condition" and has no warrant to add new concepts like indications, uses, or subpopulations to the plain statutory text.

Similarly, FDA's suggestion (FDA Cross-MSJ at 15-16) that Congress did not explicitly consider the consequences of approving an orphan drug for less than all of the population suffering from a disease, even if correct, is irrelevant. The Supreme Court has expressly held that "the fact that a statute can be applied in situations not expressly anticipated by Congress does not

18

demonstrate ambiguity.  It demonstrates breadth." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998).  If courts found "silence" in the *Chevron* sense every time Congress failed to *explicitly* identify and address a specific contingency (even if its broad text *does* address that contingency), then "the relationship between the executive and legislative branches would undergo a fundamental change and agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."  *See Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1085 (11th Cir. 2013).  That is effectively what the R&R seeks to sanction in this case.[13]

In sum, the ODE provision is not ambiguous, and ordinary principles of statutory interpretation foreclose FDA's interpretation.  And even if the provision was ambiguous (it is not), FDA's interpretation would not be reasonable or permissible for the reasons discussed above.

## II.    THE R&R MISCONSTRUES CATALYST'S CHALLENGE TO RUZURGI'S LABELING

Catalyst's Count I argued that "the Ruzurgi labeling is 'false or misleading' as a matter of law because it "implies or suggests" the drug can be used for *adult* patients with LEMS, notwithstanding the fact that Ruzurgi is only approved to treat *pediatric* LEMS patients.  Catalyst MSJ at 20.  The statute prohibits FDA from approving a drug with "false or misleading" labeling. 21 U.S.C. § 355(d).  And FDA has implemented that prohibition through regulations, including one that prohibits descriptions of a "clinical study" within a drug label that "impl[ies] or suggest[s] indications or uses" that are not approved.  21 C.F.R. § 201.57(c)(2)(iv) and (15)(i).  Ruzurgi's

---

[13] To the extent the R&R addressed the policy issue of the consequences of broad exclusivity when an approved drug is intended to treat only a subset of the patient population, that is an issue for Congress—not FDA or this Court—to address.  *See Eagle Pharm.*, 952 F.3d at 336 ("In light of an unambiguous statutory directive, it is not [a court's] place to second-guess how the Congress chose to effectuate the policy goals underlying the statute.").  Congress already provides a statutory solution through the clinical superiority provision.  21 U.S.C. § 360cc(c)(1) (emphasis added).

label violates those regulations expressly since the label explains that "Use of RUZURGI in patients 6 to less than 17 years of age is supported by evidence from adequate and well-controlled studies of RUZURGI *in adults* with LEMS." JA-442; *see also* JA-447-48 (label text providing that "efficacy of RUZURGI for the treatment of LEMS was established by" *one* clinical study, where the "range" of patient age was "23 to 83 years").[14] FDA was bound by the statute and its own implementing regulations to deny the Ruzurgi approval. *See Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("the failure of an agency to comply with its own regulations" is unlawful under the APA).

The Magistrate Judge seems to have misunderstood Catalyst's argument as "because Jacobus only conducted clinical trials in adults, approval for pediatric use without studies in children violates FDA's regulation" against false or misleading labeling. R&R at 15. Catalyst is not arguing that Jacobus had to conduct different studies, but that the specific reliance solely on adult studies on Jacobus's label falsely and misleadingly suggests the drug can be used *by* adults, in violation of the FDCA and FDA regulations. This is a real world problem: off-label prescriptions of Jacobus's drug for adult patients diminish Catalyst's ODE. The R&R failed to assess whether Jacobus's label complies with the text of FDA's regulations. R&R at 15-16.

## CONCLUSION

For the forgoing reasons, the Court should reject the R&R and enter summary judgment for Catalyst.

---

[14] This was a major, inevitable problem that arose from FDA's unprecedented "administrative division" of the Jacobus application into separate pediatric and adult indications to attempt to circumvent Catalyst's exclusivity, as Jacobus's clinical trial was only conducted in adults, consistent with its initial intention to seek approval principally for adults.

## RULE 7.1(b) REQUEST FOR HEARING

FDA has acknowledged that this case represents the first time it has split orphan drug exclusivity among pediatric and adult patients with the same disease. *See* Answer ¶ 54, ECF No. 22. A telephonic hearing is warranted to address this important and unprecedented application of the Orphan Drug Act, occurring over 30 years after the law was enacted.

Dated:  August 13, 2020

Respectfully submitted,

AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600
Facsimile:  (305) 374-5095

By: *s/Michael C Marsh*
Michael C. Marsh
Florida Bar No. 0072796
michael.marsh@akerman.com
joan.davis@akerman.com
Ryan Roman
Florida Bar No. 0025509
ryan.roman@akerman.com
lauren.chang-williams@akerman.com

*Attorneys for Plaintiff*

OF COUNSEL:

Philip J. Perry*
Email: philip.perry@lw.com
John R. Manthei*
Email: john.manthei@lw.com
Andrew D. Prins*
Email: andrew.prins@lw.com
Ryan S. Baasch*
Email: ryan.baasch@lw.com
Monica C. Groat*
Email: monica.groat@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
*Admitted *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 13, 2020, a true and correct copy of the foregoing

was served via CM/ECF on the following counsel:

Ann F. Entwistle
U.S. Department of Justice
Consumer Protection Branch
Civil Division
450 Fifth Street, NW, Sixth Floor South
Washington, DC 20001
ann.f.entwistle@usdoj.com

*Attorneys for Defendants*

Jarred Lee Reiling
Gabriel Krimm
Joel McElvain
King & Spalding, LLP
1700 Pennsylvania Avenue, Suite 200
Washington, DC 20007
jreiling@kslaw.com
gkrimm@kslaw.com
jmcelvain@kslaw.com

*Attorneys for Intervenor Defendant*

*s/Ryan Roman*
Ryan Roman