**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:19-CV-22425-BLOOM/LOUIS**


CATALYST PHARMACEUTICALS, INC.,

        Plaintiff,

  v.

ALEX AZAR, Secretary of Health and
Human Services, *et al.*,

        Defendants, *and*

JACOBUS PHARMACEUTICAL COMPANY, INC.,

        Intervenor-Defendant.

_____/


**JACOBUS PHARMACEUTICAL COMPANY, INC.'S
RESPONSE TO CATALYST PHARMACEUTICALS, INC.'S
OBJECTIONS TO THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATIONS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 6

    I.   The FDA's Approval of Ruzurgi® Comports with the Orphan Drug Act ..................... 6

        A.  The Orphan Drug Act Is Ambiguous with Respect to the Scope of
            Firdapse's® Orphan Drug Exclusivity ........................................................ 7

        B.  The FDA Has Reasonably Resolved the Statutory Ambiguity ............................. 10

        C.  Catalyst's Objections Lack Merit ......................................................... 13

    II.  Ruzurgi's® Label is Not False or Misleading ............................................... 18

CONCLUSION ................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AstraZeneca Pharm. LP v. FDA*,
  713 F.3d 1134 (D.C. Cir. 2013) ................................................................................. 9

*Auer v. Robbins*,
  519 U.S. 452 (1997) ................................................................................................. 19

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................................. 10

*Ctr. for Biological Diversity v. U.S. Army Corps. of Eng'rs*,
  941 F.3d 1288 (11th Cir. 2019) ............................................................................... 19

*Depomed, Inc. v. HHS*,
  66 F. Supp. 3d 217 (D.D.C. 2014) ........................................................................... 18

*Eagle Pharm., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ................................................................................. 18

*Falken v. Glynn Cty.*,
  197 F.3d 1341 (11th Cir. 1999) ......................................................................... 13, 19

*Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*,
  563 F.3d 1205 (11th Cir. 2009) ................................................................................. 7

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
  559 U.S. 280 (2010) ................................................................................................... 7

*Grunenthal GMBH v. Alkem Labs. Ltd.*,
  919 F.3d 1333 (Fed. Cir. 2019) ................................................................................. 8

*Halverson v. Slater*,
  129 F.3d 180 (D.C. Cir. 1997) ................................................................................. 15

*Hope v. Acorn Fin., Inc.*,
  731 F.3d 1189 (11th Cir. 2013) ............................................................................... 15

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
  915 F.3d 1 (1st Cir. 2019) ..................................................................................... 8, 9

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012) ............................................................................... 8, 15

*King v. Burwell*,
    576 U.S. 473 (2015) .................................................................................................. 7

*Lindley v. FDIC*,
    733 F.3d 1043 (11th Cir. 2013) ................................................................. 7, 10, 14

*Simmons v. Block*,
    782 F.2d 1545 (11th Cir. 1986) ............................................................................ 19

*Smith v. BellSouth Telecomms., Inc.*,
    273 F.3d 1303 (11th Cir. 2001) ..................................................................... 10, 13

*Spectrum Pharm., Inc. v. Burwell*,
    824 F.3d 1062 (D.C. Cir. 2016) ..................................................................... *passim*

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
    822 F.3d 613 (2d Cir. 2016) ................................................................................... 8

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ............................................................................................. 15

**Statutes**

21 U.S.C. § 355(a) ............................................................................................... 8, 15

21 U.S.C. § 355(b)(1) ................................................................................................ 8

21 U.S.C. § 355(c)(1) .............................................................................................. 15

21 U.S.C. § 360aa ...................................................................................................... 3

21 U.S.C. § 360bb(a) ......................................................................................... *passim*

21 U.S.C. § 360cc ................................................................................................... 11

21 U.S.C. § 360cc(a) ......................................................................................... *passim*

21 U.S.C. § 360cc(b) ............................................................................................... 17

21 U.S.C. § 360cc(c) .................................................................................. 16, 17, 18

21 U.S.C. § 360ee(b)(1)(C)(ii) ............................................................................... 16

21 U.S.C. § 360bbb ................................................................................................... 3

FDA Reauthorization Act of 2017,
    Pub. L. No. 115-52, 131 Stat. 1005 ...................................................................... 18

**Regulations**

21 C.F.R. § 201.57(c)(15) .............................................................................................. 19

21 C.F.R. § 316.3(b)(14) ............................................................................................ 3, 17

21 C.F.R. § 316.31(a) .................................................................................................. 5, 10

21 C.F.R. § 316.31(b) .................................................................................................. 5, 11

**INTRODUCTION**

The Court should adopt Judge Louis's well-reasoned Report and Recommendations, ECF No. 93 [hereinafter R&R], and grant summary judgment to the U.S. Food and Drug Administration and Jacobus Pharmaceutical Company, Inc.

When Congress passed the Orphan Drug Act, it did not speak clearly to every detail of implementation.  Instead, it left breathing room in the text and empowered the FDA to fulfill the statute's aims through the exercise of expert discretion.  In challenging that arrangement here, plaintiff Catalyst Pharmaceuticals, Inc. advances a nonsensical view of the Act wherein the approval of its drug, Firdapse®, for the treatment of Lambert-Eaton Myasthenic Syndrome *in adults* deprives the FDA of the power to approve Jacobus's drug, Ruzurgi®, for the treatment of Lambert-Eaton Myasthenic Syndrome *in children*.  Catalyst says that the statute clearly and unambiguously demands this result, despite the fact that Catalyst has not shown — or even attempted to show — that Firdapse® is safe and effective for pediatric use.

Catalyst is wrong.  The Orphan Drug Act does not clearly speak to the circumstances of this case, where a drug has been designated to treat a rare disease or condition but does not earn marketing approval to treat that disease or condition in all circumstances.  The FDA has thus adopted a reasonable interpretation of the statute, solidified through notice-and-comment rulemaking, that reconciles the various provisions of the Act to allow the agency to approve additional drug products for use under conditions that the first orphan drug's approval does not cover.  This sensible resolution of the statute's ambiguous terms warrants deference from this Court, as Judge Louis recognized.

Catalyst's back-up theory, that Ruzurgi's® label is false or misleading under the FDA's own regulations, likewise fails. The FDA has applied its labeling rules according to its expert discretion, and Catalyst has not provided this Court any basis to second-guess the FDA's expertise.

Because both of Catalyst's claims fail on the undisputed record, this Court should adopt the Report and Recommendations and grant summary judgment to the FDA and Jacobus.

## BACKGROUND

Lambert-Eaton Myasthenic Syndrome, or "LEMS," is a rare autoimmune condition that afflicts only about one out of every several hundred thousand people. *See* FDA0475, FDA0866.[1] In the bodies of those unfortunate few, the immune system disrupts the nervous system's ability to send signals to muscle cells. *See* FDA0137, FDA0475, FDA0660. That disruption causes muscle weakness and reduces the function of critical joints, the hips and shoulders in particular. *See* FDA0137, FDA0475, FDA0660, FDA0979. As the symptoms worsen, LEMS patients lose the ability to perform basic actions like rising from a chair or lifting their feet to walk. FDA0137. Some become bedridden altogether and need a feeding tube or ventilator to survive. *See id.* Although patients have recovered from LEMS following certain cancer therapies, there is no known cure otherwise. *Id.*

Fortunately, LEMS is treatable. Ingesting an appropriate dose of the chemical amifampridine[2] sets off a series of reactions in the body that enable better communication between

---

[1] The principal administrative record is in two, consecutively paginated volumes. *See* ECF Nos. 27-1, 27-2.

[2] Amifampridine has two basic chemical forms (a "free base" and "phosphate salt") and goes by multiple names in the administrative record and elsewhere. *See, e.g.*, FDA0666. Nothing in this case turns on any of the distinctions between these forms and labels.

nerves and muscles, "significant[ly] improv[ing]" the strength of LEMS patients.  *Id.*; *see also* FDA0165 (describing the chemical processes through which amifampridine works).  This effect lasts "as long as the medication is maintained," and (for obvious reasons) it "improves overall quality of life" for people suffering from LEMS.  FDA0137.

Treating LEMS with amifampridine is not a new discovery.  For more than twenty-five years, doctors at the Mayo Clinic, Duke University, and elsewhere have had the ability to treat LEMS patients with Ruzurgi®, an amifampridine drug developed and manufactured by defendant Jacobus.  *See* FDA0042–43.  Prior to Jacobus seeking marketing approval, Ruzurgi® was distributed for free pursuant to the Food, Drug, and Cosmetic Act's "compassionate use" program. *See, e.g.*, *id.*; *see also* 21 U.S.C. § 360bbb (authorizing the manufacture and administration of "investigational" drugs in certain limited circumstances).  This narrow statutory provision allows patients with serious or immediately life-threatening conditions to access investigational drugs when no comparable or satisfactory alternative therapies exist.  *See* 21 U.S.C. § 360bbb.

In recent years, however, Catalyst has sought to monopolize the limited market for amifampridine drugs by blocking FDA approval of Ruzurgi® through the Orphan Drug Act. *See* 21 U.S.C. § 360aa, *et seq*.  Under that law, the FDA may "designate" a drug "for a rare disease or condition" like LEMS while the drug is still in development.  *Id.* § 360bb(a)(1).  If and when such an "orphan-designated" drug wins FDA marketing approval, the FDA then loses the ability to approve any competing application to market "the same drug for the same disease or condition" for the next seven years.  *Id.* § 360cc(a).  Pursuant to the FDA's implementing regulations, all amifampridine drug products generally qualify as the "same drug" under the Orphan Drug Act. *See* 21 C.F.R. § 316.3(b)(14).  Accordingly, the first amifampridine drug product to be *both* orphan

designated *and* approved "for [LEMS]" would temporarily block subsequent approval of other amifampridine drug products "for the same disease or condition."  21 U.S.C. § 360cc(a).

The FDA granted Jacobus an orphan drug designation for Ruzurgi® in 1990. *See* FDA0001.  It then granted another amifampridine drug, Firdapse®, an orphan designation in 2009.  *See* FDA0525–26.  Both designations were "for treatment of Lambert-Eaton Myasthenic Syndrome," full stop.  *See* FDA0001, FDA0525–26.  Then, in October 2012, plaintiff Catalyst acquired the license to sell Firdapse® in the United States and began sponsoring its marketing application.  *See* FDA0707.  In Catalyst's view, it was now "in a race to approval" with Jacobus for the exclusive right to market an amifampridine drug to LEMS patients in the United States. FDA1025.

Catalyst won that race, but only by tailoring the scope of Firdapse's® marketing application.  Indeed, despite Firdapse's® orphan designation "for the treatment of [LEMS]" generally, Catalyst ultimately sought FDA approval of Firdapse® only for the "treatment of [LEMS] *in adults*."  FDA0854 (emphasis added); *see also* FDA0973 ("Applicant Proposed Indication(s)/Population(s): … [T]reatment of Lambert-Eaton myasthenic syndrome (LEMS) in adults 18 years of age or older.").  As a result — and again, *at Catalyst's request* — the FDA approved Firdapse® only "for the treatment of [LEMS] *in adults*."  FDA1002 (emphasis added); *see also id.* ("This NDA provides for the use of Firdapse (amifampridine) tablets for the treatment of Lambert-Eaton myasthenic syndrome (LEMS) in adults.").  The agency based that decision on its own expert assessment of Catalyst's application for marketing approval, an application that (again) made no attempt to show Firdapse® was safe and effective for the treatment of LEMS in children.  *See id.*

Tellingly, Catalyst does not challenge the Firdapse® approval order — or the FDA's underlying scientific judgment — as arbitrary, capricious, or invalid in any way. Indeed, Catalyst got exactly what it requested: the right to market Firdapse® as safe and effective for use to treat LEMS in adults. *Compare* FDA0854 *and* FDA0973 *with* FDA1002 *and* FDA1010.

Pursuant to longstanding FDA regulations, however, the limited scope of Firdapse's® marketing approval carried with it an equally limited exclusivity right. Indeed, the FDA has quite transparently determined that when it approves an orphan-designated drug's "marketing application … for [a] select indication[] or use[] *within* the rare disease or condition for which the drug was designated," the Orphan Drug Act only prohibits subsequent approvals *for that* "*use or indication.*" 21 C.F.R. § 316.31(a) (emphasis added); *see also id.* § 316.31(b) ("Orphan-drug exclusive approval protects only the approved indication or use of a designated drug."). The FDA thus remained free to approve Ruzurgi® for uses not covered by Firdapse's® marketing order, including the treatment of LEMS in children. ████████████████████████████████████ ████████████████████████████ the FDA approved Ruzurgi® for marketing to treat LEMS in patients as young as six, *see* FDA0484; *see also* R&R at 5–6 (explaining the relevant history).

Now, despite never even attempting to show that Firdapse® is safe and effective for pediatric use, Catalyst has sued the FDA to keep Ruzurgi® off the market anyway. In response to cross-motions for summary judgment, *see* ECF Nos. 38, 46, 47, 58, 61, 75, 76, Judge Louis has recommended that this Court enter judgment in favor of the FDA and Jacobus on the undisputed administrative record. *See* R&R at 19. This Court should adopt Judge Louis's recommendation and put this matter to rest.

**ARGUMENT**

As Judge Louis recognized, Catalyst's claims that the Ruzurgi® approval violated the Orphan Drug Act and the Food, Drug, and Cosmetic Act lack merit.  The FDA's decision was fully in keeping with the Orphan Drug Act because the agency did not approve Firdapse® "for the treatment of [LEMS]" as initially designated, but "for the treatment of [LEMS] *in adults*." Firdapse's® limited marketing application and approval thus left room for Ruzurgi's® pediatric-only marketing right under the FDA's reasonable and authoritative interpretation of the law. Catalyst is also wrong to insist that Ruzurgi's® label violates the Food, Drug, and Cosmetic Act and its implementing regulations.  The label clearly indicates Ruzurgi's® limited approved uses in explicit and unambiguous terms, and the FDA justifiably determined that this language is not "false or misleading."  Reaching these same sensible conclusions, Judge Louis recommended summary judgment in favor of the FDA and Jacobus.  *See* R&R at 19.  The Court should adopt that recommendation and dispatch this case accordingly.

I.   **The FDA's Approval of Ruzurgi® Comports with the Orphan Drug Act.**

Jacobus's limited right to market Ruzurgi® for the treatment of LEMS in children does not violate the Orphan Drug Act because it does not fall within the scope of Firdapse's® orphan-drug exclusivity.  The Orphan Drug Act does not clearly address the circumstances of this case, where a drug product's marketing approval fails to live up to its initial orphan designation.  The FDA has reasonably resolved that ambiguity through duly promulgated regulations, which it faithfully applied to the Firdapse® and Ruzurgi® approvals.  Judge Louis correctly recognized this, and Catalyst's arguments challenging her report all lack merit.

### A.   The Orphan Drug Act Is Ambiguous with Respect to the Scope of Firdapse's® Orphan Drug Exclusivity.

To begin, the Orphan Drug Act does not speak clearly to the circumstances of this case.  A statute is ambiguous if it has more than one reasonable interpretation.  *See Lindley v. FDIC*, 733 F.3d 1043, 1056 (11th Cir. 2013); *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1210 (11th Cir. 2009).  And the statutory language Congress used here left multiple ambiguities for the FDA to resolve.

The FDA was tasked with reconciling two particular provisions of the Orphan Drug Act with each other and with the overall statutory scheme.  *First*, the Act says that when a drug "is being or will be investigated for a rare disease or condition and … if an application [to market] such drug is approved … the approval … would be for use for such disease or condition," the FDA may "designate the drug as a drug for such disease or condition."  21 U.S.C. § 360bb(a).  *Second*, the Act says that if the FDA approves a marking application "for a drug designated under [the Orphan Drug Act] for a rare disease or condition, [the FDA] may not approve another application [for marketing approval] … for the same drug for the same disease or condition for a person who is not the holder of such approved application … until the expiration of seven years from the date of the approval of the approved application."  *Id.* § 360cc(a).

But these provisions do not stand alone.  Instead, they must be read and applied in context, with a view towards the law's broader drug-approval regime.  *See King v. Burwell*, 576 U.S. 473, 486 (2015) ("Our duty, after all, is 'to construe statutes, not isolated provisions.'"  (quoting *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010)).  And considered in that context, the application of these provisions to the circumstances of this case is far from clear.

7

For starters, the FDA generally does not approve the marketing of drug products "for … disease[s] or condition[s]," as the Orphan Drug Act read by itself might seem to suggest.  21 U.S.C. §§ 360bb(a), 360cc(a).  Instead, pursuant to its powers under the Food, Drug, and Cosmetic Act, the FDA approves the marketing of drug products for the "specific medical *use*[*s*]" indicated on their labels.  *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 239 (3d Cir. 2012) (emphasis added) (citing 21 U.S.C. § 355(a)); *see Spectrum Pharm., Inc. v. Burwell*, 824 F.3d 1062, 1065–66 (D.C. Cir. 2016); *see also* 21 U.S.C. § 355(b)(1) (requiring new drug applicants show a drug "is safe for use" and "effective in use"); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 5 (1st Cir. 2019) ("[T]he manufacturer must demonstrate the drug's efficacy *for the indicated use* …." (emphasis added)).  And such "uses" can, but often do not, cover treatment of an entire "disease or condition" in all circumstances.  Indeed, indicated uses frequently address discrete medical issues in specific clinical contexts.  *See U.S. ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 615 (2d Cir. 2016); *cf., e.g.*, *Grunenthal GMBH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1338 (Fed. Cir. 2019) (observing the FDA's approval of a drug "indicated for the management of … neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults when a continuous, around-the-clock opioid analgesic is needed for an extended period of time" (emphasis omitted)).

In addition, and relatedly, the Orphan Drug Act takes for granted that a drug product will be designated, developed, reviewed, and approved for a single, consistently identifiable, and foreseeable use.  *See* 21 U.S.C. § 360bb(a) (permitting the orphan designation of a drug under development "*if*" the drug's eventual "approval" years later "would be for use for [the designated] disease or condition" (emphasis added)).  In the real world, although drug manufacturers often develop a product with a particular use in mind, they are often forced to adjust their expectations

as the development process unfolds.  This case illustrates that reality:  Before Catalyst acquired

the license to market Firdapse®, the drug had already been "designated" as an orphan drug "for

[the] treatment of [LEMS]" without qualification.  *See* FDA0525–26 (emphasis omitted).  Under

the terms of the Orphan Drug Act, this meant that the FDA expected to receive an application to

market Firdapse® "for [the] treatment of [LEMS]" and, if appropriate, approve that application

without qualification.  *See* 21 U.S.C. § 360bb(a).  But by the time Catalyst submitted the

application several years later, it *did not* request approval to market Firdapse® to the full extent of

Firdapse's® orphan designation.  Instead, Catalyst asked to market Firdapse® only for the

"treatment of [LEMS] *in adults*" — a more limited use than the orphan designation anticipated.

FDA0854 (emphasis added); *see also* FDA0973 (same).

The Orphan Drug Act does not speak directly to this circumstance.  The FDA designated

Firdapse® as an orphan drug "for a rare disease or condition": LEMS.  *See* FDA0525–26.  But the

FDA *did not approve* Firdapse® "for use for such disease or condition."  21 U.S.C. § 360bb(a).

Instead, the FDA approved Firdapse® for a *narrower* use: the treatment of LEMS (a disease) in

adults (a clinical context).  *See* FDA1002; FDA1010.  This was not unusual — it is how the

development and approval process often works.  *See In re Celexa*, 915 F.3d at 6 ("The FDA

approved Celexa and Lexapro for the treatment of major depressive disorder ('MDD') in adults …

[but] has never approved Celexa for any pediatric use nor has it approved Lexapro as a treatment

for depression in children …."); *AstraZeneca Pharm. LP v. FDA*, 713 F.3d 1134, 1137 (D.C. Cir.

2013) ("Separately, AstraZeneca submitted two sNDAs in support of new pediatric indications of

Seroquel ….").  But it did leave the FDA with two critical interpretive questions:  *First*, can an

orphan-designated drug win marketing approval for a use that is not coextensive with the drug's

initial orphan designation?  *Cf. Spectrum*, 824 F.3d at 1067 (noting that despite the statute's

reference to designated diseases or conditions, "[t]he statute creates limits on the approval of an 'application,' which by implication directs FDA to evaluate what is written in the application"). *And second*, if the drug does obtain a truncated approval, does the Act's exclusivity cover the full extent of the initial designation or, alternatively, the *use* for which the drug has actually been approved. *Cf. id.* (noting the statutory language's "focus[] on protecting approved indications").

Because those questions have multiple reasonable answers, Judge Louis correctly held that the Orphan Drug Act is ambiguous as applied to this case. *See* R&R at 10–12; *Lindley*, 733 F.3d at 1056.

### B.      The FDA Has Reasonably Resolved the Statutory Ambiguity.

Judge Louis also correctly determined that the FDA has interpreted and applied the statute in a reasonable manner entitled to deference from this Court.  When a federal agency exercises its rulemaking power to resolve a statutory ambiguity, the courts will defer to that interpretation so long as it is reasonable. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984); *Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1305 (11th Cir. 2001).  In this case, the FDA used notice-and-comment rulemaking to promulgate regulations sensibly resolving the ambiguities just discussed.  That course warrants deference from this Court and supports summary judgment for the FDA and Jacobus.

Catalyst should have expected as much.  Years before Catalyst ever applied for FDA approval of Firdapse®, the FDA made crystal clear that the Orphan Drug Act allowed it to "approve … marketing application[s] … for select … use(s) within the rare disease or condition for which the drug was designated."  21 C.F.R. § 316.31(a).  And Catalyst obviously does not challenge this regulation because Catalyst *relied* on this language when it sought approval to market Firdapse® for a use not coextensive with Firdapse's® orphan designation. *See* FDA0854; FDA0973.  In fact,

10

it is only because of this regulation that Firdapse® enjoys any marketing exclusivity at all.  This is,

again, because — contrary to Catalyst's breathless insistence — it *did not* show that Firdapse® was

safe and effective "for [the] treatment of [LEMS]," FDA0525–26 (emphasis omitted), but only

that Firdapse® was safe and effective "for the treatment of [LEMS] *in adults*."  FDA1002

(emphasis added); *see* FDA1010.

Catalyst thus predictably takes issue only with the regulation's next paragraph, which quite

sensibly states that "[o]rphan-drug exclusive approval protects only the approved indication or use

of a designated drug."  21 C.F.R. § 316.31(b).  This means that if an orphan-designated drug's

"approval is limited to only particular indication(s) or use(s) within the rare disease or condition"

designated, as Firdapse® was, the FDA retains the power to approve additional products using the

same drug "for additional indication(s) or use(s) … not protected by the exclusive approval."  *Id.*;

*cf. Spectrum*, 824 F.3d at 1066 (observing the FDA's use of such "labeling carve-outs" in this

context and elsewhere and noting that it is "an acceptable interpretation of the Food, Drug, and

Cosmetic Act").

As Judge Louis correctly recognized, this interpretation "fits closely with the statute's

text."  R&R at 13.  The text ties exclusivity to *both* designation *and* approval.  *See* 21 U.S.C.

§ 360cc.  To win exclusivity, a drug must first be "designat[ed] … as a drug for a rare disease or

condition," *id.* § 360bb(a)(1), and then "approve[d] … for [that] rare disease or condition," *id.*

§ 360cc(a); *see also id.* § 360bb(a)(1) (specifying that designation is warranted if "the approval [of

a new drug application for the designated drug] … would be for use for such disease or condition").

And the exclusivity operates by denying the FDA power to "*approve* another [marketing

application] … for the same drug *for the same disease or condition* for a person who is not the

holder of [the first-approved marketing] application."  *Id.* § 360cc(a) (emphasis added).  The

FDA's interpretation thus reconciles the separate processes for designation and marketing approval to ensure that exclusivity follows *both* designation *and* approval, as the statutory text demands.

In so doing, the "FDA's interpretation [also] conforms to the statutory purposes of the Orphan Drug Act." R&R at 13. All parties agree that the Act aims to "expand drug access to individuals with rare diseases." *Id.* The FDA's rules further that aim by preserving the incentive to develop innovative drug products for use under circumstances not yet covered by any FDA-approved medication. *Id.* And indeed, those incentives operated as intended in this case, allowing approval of Ruzurgi® for the treatment of pediatric LEMS patients, for whom Firdapse® had not been proven safe and effective. *See supra* at 4–5.

By contrast, Catalyst's preferred reading would allow drug companies to seek and secure narrower marketing rights that nonetheless prohibit competitors from developing treatments for yet-unserved patients. This strains both the text and common sense. *See* R&R at 13. If Congress created the Orphan Drug Act to incentivize development of drugs for rare diseases, it does not follow that Congress would allow an overbroad preliminary designation to eclipse the use for which a drug is ultimately proposed and approved. That policy would, by design, inhibit the development and marketing of drugs for treating rare diseases in clinical contexts that do not yet have an FDA-approved drug treatment. Again, this case exemplifies that oddity: To accept Catalyst's argument is to say that Congress clearly and unambiguously intended to stall approval of other amifampridine drugs to treat LEMS in children, *even though it would leave those children with no drug treatment generally approved for marketing*. Nothing in the statutory text compels this odd, self-defeating result.

In sum, the FDA exercised its expert understanding of drug development and approval to choose the best interpretation of a diffuse and ambiguous statute. *Cf. Spectrum*, 824 F.3d at 1068

("To the extent FDA has discretion in choosing how best to implement the Orphan Drug Act it is up to the agency to strike the balance between the congressional policy goals of drug affordability and innovation.").  It then solidified that interpretation through notice-and-comment rulemaking, allowing a full public vetting that put regulated parties on notice of how the regulatory scheme would operate.  *Cf. Falken v. Glynn Cty.*, 197 F.3d 1341, 1346 (11th Cir. 1999) ("As with all agency rules, the DOL's regulations implementing the FLSA are accorded *Chevron* deference.").  Catalyst has no room to complain about Ruzurgi's® approval for a limited and distinct use not covered by Firdapse's® exclusivity — it was lawful under this reasonable and clearly articulated regime.

### C.      Catalyst's Objections Lack Merit.

Having failed to convince Judge Louis of the Orphan Drug Act's clarity, Catalyst now provides this Court with a laundry list of arguments supposedly compelling its preferred reading of the statute.  These arguments lack merit; the Court should reject them.

*First*, Catalyst says that "the term 'same disease or condition' is simply not ambiguous." Objections at 14, ECF No. 94 [hereinafter Obj.].  Even if that is true, it is completely beside the point.  The ambiguity arises *not* from the term "disease or condition" standing on its own, but from the term's awkward fit within the broader regulatory regime.  *See supra* at 7–10; *cf. Smith*, 273 F.3d at 1313 (holding a statutory term to be ambiguous based on "context" and "Congress's purpose[]").  And although Congress defined the term "rare disease or condition" in the statute, that definition only clarifies the meaning of "rare."  *See* 21 U.S.C. § 360bb(a)(2) (defining "rare disease or condition" to mean "any disease or condition which (A) affects less than 200,000 persons in the United States, or (B) affects more than 200,000 in the United States and for which there is no reasonable expectation that the cost of developing and making available in the United

States a drug for such disease or condition will be recovered from sales in the United States of such drug.").  It is completely circular — and thus completely useless — with respect to clarifying the intended meaning or application of the term "disease or condition" itself.  *See id.*

*Second*, and relatedly, Catalyst argues that "nothing about the interplay of other Orphan Drug Act provisions can render the straightforward term 'same disease or condition' ambiguous." Obj. at 14.  But in making this argument Catalyst totally ignores the statute's clear requirement that exclusivity turn on *both* designation *and* approval.  *See supra* at 7–10.  Indeed, Catalyst's reading appears to contend that the scope of a drug's marketing approval does not affect exclusivity *at all* — a bizarre position given that exclusivity itself arises upon approval and derives from a suspension of the FDA's marketing-approval power.  *See* 21 U.S.C. § 360cc(a) (entitled "Exclusive approval, certification, or license").  And even if the statute did tie exclusivity to a drug's designation alone, it would still tie designation to a drug's anticipated approved *use*.  *See* 21 U.S.C. § 360bb(a).  The FDA thus could not avoid reconciling a drug's designation and approval where, as here, a drug manufacturer neither requests nor receives approval to market a drug "for treatment of a rare disease or condition" in all circumstances.  *See supra* at 4, 9–10.

*Third*, Catalyst insists that there is no textual hook for tying exclusivity to the scope of a drug's approval rather than its original orphan designation.  Obj. at 15.  Again, that is wrong.  *See supra* at 7–10.  The fact that Congress could have more clearly tied exclusivity to the drug's approved use makes no difference either.  It could also have more clearly tied exclusivity to a drug's designation alone.  The fact that it did neither is precisely what makes the statute ambiguous.  *See Lindley*, 733 F.3d at 1056.

Catalyst is also off base to suggest that, by tying exclusivity to a drug's approved use, the FDA has assumed "an unreasonable amount of discretion."  Obj. at 15.  It is the *manufacturer* who

determines a drug's labeled uses by proposing those uses in its New Drug Application.  *See* FDA0973; ███████ *see also Wyeth v. Levine*, 555 U.S. 555, 570–71 (2009) ("[I]t [is] a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.").  And so long as the application shows that a drug is safe and effective for the uses the manufacturer has proposed, the FDA has no choice but to approve the application.  *See* 21 U.S.C. § 355(c)(1) (providing that the FDA "*shall* … approve [a New Drug Application] if [it] finds that none of the grounds for denying approval … applies" (emphasis added)).  That is why, in this case, Catalyst got what it requested and deserved: approval to market Firdapse® for the treatment of LEMS *in adults*.  *Compare* FDA0854 *and* FDA0973 *with* FDA1002 *and* FDA1010.

*Fourth*, Catalyst argues that by failing to explicitly reference a drug's approved "uses" in the Orphan Drug Act, as it does elsewhere in the codebooks, Congress unambiguously intended to foreclose the FDA's implementing rules.  Obj. at 16.  But "[t]he … presumption on which [Catalyst] relies is only a presumption," *Hope v. Acorn Fin., Inc.*, 731 F.3d 1189, 1192 (11th Cir. 2013), and a particularly weak one when used to compare "different language in … different enactments," *Halverson v. Slater*, 129 F.3d 180, 186 (D.C. Cir. 1997).   More importantly, Congress *did* reference "uses" in the Orphan Drug Act when it provided that the FDA may designate a drug "for a rare disease or condition" *if* the drug's eventual marketing approval "would be *for use* for such disease or condition."  21 U.S.C. § 360bb(a)(1).  And even if Congress had never mentioned "uses" expressly, the Act would still incorporate that concept because "uses" are what the FDA *approves drugs for*.  *See In re Schering*, 678 F.3d at 239 (citing 21 U.S.C. § 355(a)); *Spectrum*, 824 F.3d at 1067.  The agency thus could not escape the question of what to do when a drug fails to win marketing approval "for [a] rare disease or condition" generally, but instead asks

and receives approval for a more limited use to treat a rare disease or condition in a particular clinical context. *See supra* at 7–10.

*Fifth*, Catalyst says that Congress's reference to "subpopulations affected by a rare disease or condition" elsewhere in the Orphan Drug Act also precludes the FDA's rule. Obj. at 16–17 (emphasis omitted) (quoting 21 U.S.C. § 360ee(b)(1)(C)(ii)). Here again, Catalyst sidesteps the real debate. The issue is not whether "adult LEMS" and "pediatric LEMS" are the "same disease." The issue is whether Firdapse's® designation "for the treatment of [LEMS]" generally and approval "for the treatment of [LEMS]" only in some clinical contexts precludes the approval of Ruzurgi® "for the treatment of [LEMS]" only in *other* contexts for which Firdapse's® *is not approved*. *See* R&R at 10–12. And although Catalyst critiques Judge Louis's use of the term "disease or condition" when discussing both orphan designation and marketing approval, her analysis makes clear that she recognized an ambiguity in the statute's directive to base orphan drug exclusivity on both designation and approval, especially when a drug's approved use does not match the "disease or condition" for which it was orphan designated. *See* R&R at 2–4, 10–11. Statutory references to the study of a disease in "distinct subpopulations" offer little guidance on how to resolve that ambiguity, much less eliminate it completely.

*Finally*, Catalyst says that by including certain exceptions to exclusivity in the statute, Congress meant to foreclose additional exceptions, including the regulations at issue here. Obj. at 17. Catalyst has again misread the statute in multiple crucial respects.

To begin, Catalyst repeatedly claims that Congress expressly provided the FDA authority to approve "clinically superior" drug products, even when doing so would violate a preexisting, operative exclusivity right. *See* Obj. at 2, 17, 19 n.13 (repeatedly citing 21 U.S.C. § 360cc(c)). That is not true. The "clinical superiority" provision that Catalyst points to allows the FDA to

grant additional, successive exclusivity rights to "clinically superior" drug products *after* the first-approved product's exclusivity has expired. *See* 21 U.S.C. § 360cc(c)(1) (requiring a showing of clinical superiority "as a condition of … *exclusive* approval or licensure" (emphasis added)); *see also id.* § 360cc(a)(2) (prohibiting "approv[al of] another [marketing] application … for the same drug … until the expiration of seven years from the date of the [first-approved drug's] approval"). The clinical superiority "exception" Catalyst likely *meant* to reference appears in the *FDA regulations* clarifying Congress's ambiguous use of the term "same drug." There, the FDA has determined that two drug products are not the "same drug" if one is clinically superior to the other. *See* 21 C.F.R. § 316.3(b)(14). Of course, Catalyst does not challenge this regulation — which resolves *another* statutory ambiguity — because it is only through this provision that Firdapse® and Ruzurgi® qualify as the "same drug" in the first place. *See id.*

Moreover, and in any event, this case does not concern an "exception" to exclusivity — statutory or otherwise. The statutory exceptions allow the FDA to grant additional marketing approvals *within* and *in spite of* a preexisting exclusivity where the manufacturer of the first-approved (exclusive) drug either (1) consents or (2) cannot meet demand. *See* 21 U.S.C. § 360cc(b). They offer no indication of how Congress intended to fix the breadth of exclusivity from the outset, which is the issue at play here. *See* R&R at 12; 21 U.S.C. § 360cc(b) (cross-referencing "subsection (a)" to describe the breadth of an exclusivity right and provide "exceptions" *within* that right). Indeed, Catalyst's argument assumes what it is trying to prove: that Firdapse's® approval for use to treat *some* patients with LEMS made it the exclusive FDA-approved treatment option for *all* patients with LEMS, regardless of whether it has been shown safe and effective for them. Because the statute does not compel that outcome, *see supra* at 7–10, the FDA's rule is no "exception" to exclusivity.

The same circular reasoning also infects Catalyst's persistent, misplaced reliance on *Eagle Pharmaceuticals, Inc. v. Azar*, 952 F.3d 323 (D.C. Cir. 2020), and *Depomed, Inc. v. HHS*, 66 F. Supp. 3d 217 (D.D.C. 2014), *superseded by* FDA Reauthorization Act of 2017, Pub. L. No. 115-52, § 607, 131 Stat. 1005, 1049.[3]  Both cases did indeed concern an exception to exclusivity that the FDA inferred despite its absence from the statute.  *See Eagle*, 952 F.3d at 331.  But the regulation at issue here is neither an exception to exclusivity nor a free-wheeling amendment to the statute.  The regulation at issue here helps define the initial parameters of an exclusivity right Catalyst undisputedly holds, not the circumstances under which that right may be ignored.  *See supra* at 9–10.  And the FDA did not promulgate this regulation to enhance Congress's exclusivity regime; it promulgated this regulation to reconcile how various provisions of the Orphan Drug Act apply to the legal and practical nuances of Congress's longstanding *drug-approval* regime.  *See supra* at 9–11.  In other words, the FDA played precisely the role it is supposed to play — using experience and expertise to implement a less-than-pellucid congressional directive.  Its conduct warrants deference from this Court.

## II.    Ruzurgi's® Label is Not False or Misleading.

Catalyst also objects to the Report and Recommendations on the grounds that Judge Louis "misconstrue[d] Catalyst's challenge to Ruzurgi's labeling."  *See* Obj. 19–20.  But regardless of how it was construed, Catalyst's argument is wrong.

This contingency challenge to Ruzurgi's® approval relies on the faulty premise that the FDA misinterpreted its own regulations when it approved the clinical study statement on

---

[3] The amendment added the statutory provision on "clinical superiority," 21 U.S.C. § 360cc(c), discussed *supra*.

Ruzurgi's® label.  Under those regulations, a drug label's "Clinical Studies" section "must discuss those clinical studies that facilitate an understanding of how to use the drug safely and effectively." 21 C.F.R. § 201.57(c)(15).  Pursuant to that requirement, Ruzurgi's® label had to mention the adult studies, and the FDA could hardly be faulted for taking an action that it was required to take.

Catalyst nonetheless cites to regulations that prohibit the discussion of clinical studies "imply[ing] or suggest[ing] indications or uses … not stated in the 'Indications and Usage' … section."  *Id.* § 201.57(c)(15)(i).  But the FDA reasonably concluded that, when read in full, the "Pediatric Use" section of Ruzurgi's® label merely identifies adult studies alongside "pharmacokinetic data," "pharmacokinetic modeling and simulation," and "safety data from pediatric patients" that support the drug's indicated use for treatment of LEMS *in children*. FDA0498.  And in the face of the agency's expert judgment, Catalyst offers no precedent that would support this Court substituting its own interpretation of Ruzurgi's® label for that of the FDA.  *See* Obj. at 20 (citing only *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986), for the unremarkable proposition that it is unlawful for an agency to violate its own regulations).  That is for good reason: what a drug label "implies" or "suggests" is inherently open to interpretation, and so long as the FDA's judgment is not "plainly erroneous or inconsistent with the regulation" — which it is not — this Court must defer to that reasonable application.  *E.g. Falken*, 197 F.3d at 1350 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see also Ctr. for Biological Diversity v. U.S. Army Corps. of Eng'rs*, 941 F.3d 1288, 1300 (11th Cir. 2019) ("Because the Corps tailored its analysis according to a reasonable interpretation of its own regulations and its own substantive expertise, the Corps' interpretation should be deferred to.").

In sum, Catalyst has given this Court no colorable justification for second-guessing the FDA's expert application of its own labeling rules.  This Court should not do so.

**CONCLUSION**

For the foregoing reasons, the Court should adopt Judge Louis's Report and Recommendation, grant summary judgment to the FDA and Jacobus, and deny summary judgment to Catalyst.

Dated: September 3, 2020.                    Respectfully submitted,

                                              */s/ Joel McElvain*
                                              Joel McElvain, *Pro Hac Vice*
                                              Jarred L. Reiling, Florida Bar No. 93930
                                            Gabriel Krimm, *Pro Hac Vice*
                                              KING & SPALDING LLP
                                            1700 Pennsylvania Ave., NW
                                            Washington, DC 20006
                                            Tel: 202-626-2929
                                            Fax: 202-626-3737
                                            jmcelvain@kslaw.com
                                            jreiling@kslaw.com
                                            gkrimm@kslaw.com

                                            *Counsel for Intervenor-Defendant*
                                            *Jacobus Pharmaceutical Company, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on September 3, 2020, the foregoing was filed via the Court's CM/ECF

filing system which will send a notification of filing to all counsel of record.

*/s/ Joel McElvain*

Joel McElvain